[Cite as *State v. Smith*, 2013-Ohio-1226.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2012-CA-17 |
| MICHAEL P. SMITH | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Criminal appeal from the Guernsey County Court of Common Pleas, Case No.11-CR-40

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     March 18, 2013

APPEARANCES:

For Plaintiff-Appellee

DANIEL PADDEN
Guernsey County Prosecuting Attorney
139 West 8th Street
Box 640
Cambridge, OH 43725

For Defendant-Appellant

STEPHEN GOLDMEIER
Assistant State Public Defender
250 East Broad Street – Suite 1400
Columbus, OH 43215

*Gwin, P.J.*

{¶1} Appellant Michael P. Smith ("Smith") appeals from the May 24, 2012 judgment entry of the Guernsey County Court of Common Pleas convicting him of murder, attempted murder, felonious assault, having a weapon under a disability, and grand theft. Plaintiff-appellee is the State of Ohio.

*FACTS AND PROCEDURAL HISTORY*

{¶2} Kyle Carter's presence, along with his dog, in an apartment building at 903 Stewart Avenue, Cambridge, Ohio became a source of anxiety for Smith. In addition, Smith contended that Carter neglected to clean up after his dog, leaving waste in the front lawn. Smith first tried complaining to the leasing company, but Carter and his dog remained on the premises. Verbal altercations occurred between the two for some time.

{¶3} On March 5, 2011 Jessica Beckett, a resident of the apartment building observed Smith walk up the shared stairway that led to Becket's apartment and another apartment where Kyle Carter was currently staying. Becket testified Smith was banging on the door and yelling at them saying, "he wanted the squatters out of here and their damn dog out of here, and he was going to kill them, and he was going to beat their ass." Becket testified she was very scared of this event and eventually decided to purchase a weapon for protection.

{¶4} Carter and his girlfriend Katrina Adamik were alarmed. Carter called a friend, Trevon Bundy, and reported what had transpired between them and Smith in a voicemail message to Bundy's telephone.

{¶5} On March 8, 2011, Smith again confronted Carter to tell him that he and his dog were violating the terms of the lease and he had to go. As the verbal altercation

escalated, Carter's friend from across the street, Cody Heskett, came to assist him. Smith was yelling at the two young men to come over to his porch so he could kick their ass. The shouting match grew louder, but Smith never left his porch. Heskett tore off his shirt and beat his chest, as if preparing for a fight with Smith. Carter responded to the threats and shouts with his own angry and violent words. Smith claimed that the two young men said that they had a gun back at Mr. Heskett's house, which frightened Smith. Heskett later told his brother that his intention was to go back to the house and get his shotgun so he could shoot Smith.

{¶6} Smith ran inside, grabbed his Springfield .45 Caliber semiautomatic handgun, and fired a shot from his porch toward the street at Cody Heskett. That shot missed Heskett. Smith fired a second time striking and eventually killing Kyle Carter.

{¶7} Moments before the shooting, Ms. Beckett testified that she heard Smith yell, "I'm going to get my .45 and blow you up," which she took to mean he was going to get a gun out of his apartment. At this point, Beckett called the police. However, a concerned citizen, Linda Phillips had already called the police to report that she had heard shouts threatening violence and it looked like an old man was antagonizing two boys who were out in the street.

{¶8} On or about 4:09 p.m. on that day, Lieutenant Kevin Love and Patrolman David Long of the Cambridge Police Department were on routine patrol. They received a call from dispatch, indicating some type of disturbance in the area of the apartment building. Lieutenant Love indicated it took them about a minute to travel from their location, to the dispatched location. As the officers were pulling to the dispatched intersection, Lieutenant Love testified that he heard a gunshot. Lieutenant Love then

saw a man in a white T-shirt hunch over, and put his hands on his stomach as he crossed 9th Street from the east side, to the west side of the street staggering rather slumped over. The man made it across the street, crossing between two parked cars, fell to his knees, still clenching himself, he bent over and put his forehead in the grass and then immediately fell over on his side. The Lieutenant testified there was a lot of yelling and confusion. Lieutenant Love further testified at first he could not identify the man, but later identified him as Kyle Carter.

{¶9} From their location, the Lieutenant and Patrolman deciphered through the yelling, that the man who shot Carter was in the big white house across the street, 903 Stewart, which is an apartment building on the northeast corner of that intersection.

{¶10} Carter Baldwin and Terrence Holdren each testified that, as they pulled up to the stop sign at Stewart Avenue and 9th Street, they saw Smith take aim at the two young boys who were standing nearby. Baldwin and Holdren indicated that they saw Smith, with his arms together, holding a gun on the banister, aiming it at one of the kids. Baldwin testified that he believed the man with the gun was aiming at one of the kids.

{¶11} After the shooting, Smith found a car with the keys still in it and drove off. He thought better of fleeing town, so he instead went to Brenda Berger, a family friend, to seek help. Smith told Mrs. Berger that he had shot at the two young men. He told Mrs. Berger that he was scared for his life, and he reacted the only way he could think of to try to scare them. He said that he had never meant to hurt the young men, just to scare them and protect himself.

{¶12} Knowing that Smith did not actually own a car, Mrs. Berger told Smith that she would not let him stay in the house and that he could not have the stolen car there.

Smith left briefly to return the car to a safe location. While he was gone, Mrs. Berger called the police and informed them that Smith would be on her porch for them to come get him. After both Smith and law enforcement arrived at the house, Smith complied with the officers' orders and calmly turned himself in to the police. Soon after being taken to the county jail, Smith learned that he had caused Carter's death. When he learned this, Smith broke down and relayed to the police the events of that day.

{¶13} Smith was charged with aggravated murder of Carter, with instructions in the alternative for murder and voluntary manslaughter. He was also charged with attempted aggravated murder of Mr. Heskett, with instructions in the alternative for attempted murder and attempted voluntary manslaughter. Mr. Smith also faced charges for felonious assault against Heskett, grand theft of the car, and having a weapon under a disability.

{¶14} After a six day jury trial Smith was convicted of the lesser offenses of murder and attempted murder, grand theft, and having a weapon under a disability. His conviction for felonious assault merged with his conviction for attempted murder. He was sentenced for the murder to 15 years to life, plus a repeat violent offender specification of 10 years and a firearm specification of 3 years. He was sentenced for the attempted murder to 10 years plus three for the repeat violent offender specification. His sentence for three years for the theft and one year for the weapon under disability charge ran concurrently to his sentences for murder and attempted murder. His total sentence was 48 years to life.

### ASSIGNMENTS OF ERROR

{¶15} Smith raises five assignments of error,

**{¶16}** "I. THE TRIAL COURT'S ADMISSION OF A VOICEMAIL RECORDED BY MR. CARTER VIOLATED MR. SMITH'S CONSTITUTIONAL RIGHT TO BE CONFRONTED WITH THE WITNESSES AGAINST HIM. SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION; *CRAWFORD V. WASHINGTON*, 541 U.S. 36, 124 S.CT. 1354, 158 L.ED.2D 177 2004). (STATE'S EXHIBIT CC; T.T. AT 774).

**{¶17}** "II. THE TRIAL COURT'S ADMISSION OF A VOICEMAIL RECORDED BY MR. CARTER VIOLATED THE PROHIBITION ON HEARSAY EVIDENCE, AS THE RECORDING WENT BEYOND MERELY ESTABLISHING MR. CARTER'S FEAR OF MR. SMITH, IN VIOLATION OF MR. SMITH'S RIGHT TO DUE PROCESS. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION; ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION. (STATE'S EXHIBIT CC; T.T. AT 774).

**{¶18}** "III. THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING THE STATE TO INTRODUCE UNRELIABLE AND UNSCIENTIFIC EXPERT TESTIMONY, VIOLATING MR. SMITH'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL. FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION; EVID.R. 702; *DAUBERT V. MERRILL DOW PHARMACEUTICALS, INC., 509* U.S. 579, 113 S. CT. 2786, 125 L. ED. 2D 469 (1993). (JULY 25, 2011 ENTRY; JULY T. AT 102).

**{¶19}** "IV. MR. SMITH'S CONVICTIONS FOR MURDER AND ATTEMPTED MURDER ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE, IN VIOLATION OF HIS RIGHT TO DUE PROCESS. FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S.

CONSTITUTION; ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION. (MAY 10, 2012 JUDGMENT OF CONVICTION).

{¶20} "V. THE TRIAL COURT'S ERRORS IN ADMITTING TESTIMONIAL STATEMENTS WITHOUT CROSS-EXAMINATION, IN IMPROPERLY ADMITTING HEARSAY EVIDENCE, IN ADMITTING UNSCIENTIFIC AND UNRELIABLE EXPERT TESTIMONY, AND THE JURY'S ERROR IN MISCONSTRUING THE WEIGHT OF THE EVIDENCE, CUMULATIVELY DENIED MR. SMITH HIS FEDERAL AND STATE RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION; SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION. (MAY 10, 2012 JUDGMENT OF CONVICTION)."

I, II.

{¶21} In his first assignment of error, Smith maintains that the admission of a voicemail message sent by the decedent days before his death violated his right to confrontation; in his second assignment of error, Smith argues that the voicemail message was inadmissible hearsay. Because we find the issues raised in Smith's first and second assignments of error are closely related for ease of discussion we shall address the assignments of error together.

{¶22} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."

{¶23} In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court of the United States held that out-of-court statements that

are testimonial are barred, under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court.

{¶24} "To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay." *United States v. Deitz,* 577 F.3d 672, 683 (6th Cir.2009). A statement is testimonial where a reasonable person would anticipate that his or her statement would be used "against the accused in investigating and prosecuting the crime." *United States v. Cromer,* 389 F.3d 662, 675 (6th Cir.2004). *See also State v. Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at paragraph two of the syllabus.

{¶25} Recently, the Ohio Supreme Court has provided the following guidelines to determine whether a statement made by a victim to family or friends is testimonial and therefore inadmissible under *Crawford,*

> Delores's statements to Jeffries do not involve police interrogation. Therefore, in order to resolve the Confrontation Clause question, we look to *State v. Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E. 2d 834, paragraph one of the syllabus, which sets forth the applicable test.
>
> In *Stahl,* we adopted the "objective witness test" for out-of-court statements made to a person who is not law enforcement. We explained that such a statement is testimonial for Confrontation Clause purposes if the witness would have reasonably believed that her statement would be available for use at a later trial. *Id.* The focus is on "the expectation of the declarant at the time of making the statement; the intent of a questioner is

relevant only if it could affect a reasonable declarant's expectations." *Id.* at paragraph two of the syllabus.

Delores's statements were made to a friend after Delores arrived at her home. Delores was crying and hysterical when she told Jeffries that her husband had told her that he killed the woman found in the cemetery. An objective witness would not reasonably believe that Delores's statements to her friend while in an emotional state, repeating what her husband had told her, would be available for later use at trial. Indeed, Delores did not call the police until *after* she told Jeffries what Jones had told her.

Ohio courts of appeals have reached the same conclusion in similar situations. *See State v. Zadar,* 8th Dist. No. 94698, 2011-Ohio-1060, 2011 WL 826271, ¶ 38 (statements to a friend and a therapist not testimonial under "objective witness" test); *State v. Peeples,* 7th Dist. No. 07 MA 212, 2009-Ohio-1198, 2009 WL 737922, ¶ 31 (statement to a friend not testimonial because objective witness would not reasonably believe that the statement would later be used at trial).

*State v. Jones*, ___Ohio St.3d___, 2012-Ohio-5677, 2012 WL6553401 (Dec. 6, 2012), ¶¶160-163.

**{¶26}** We find the voicemail statements of the decedent to be non-testimonial in nature, and thus, the Confrontation Clause does not bar them. Carter made the statements to Bundy. Bundy is not a law-enforcement officer, and the statements "were not the result of any official examination." *State v. Nix,* 1st Dist. No. C-030696, 2004-

Ohio-5502, ¶75. Additionally, Carter's primary purpose in telling his friend was not to aid in the prosecution or the result of an interrogation, but rather to speak of the events with his friend. See *United States v. Manfre*, 368 F.3d 832, 838(8th Cir. 2004), fn. 1 ("Mr. Rush's comments were made to loved ones or acquaintances and are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks").

**{¶27}** Having determined that Carter's voicemail statement to Bundy was not testimonial and therefore was not barred by the Confrontation Clause, we must also now decide whether the statement was admissible under our rules of evidence. *Jones,* ¶ 165.

**{¶28}** "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hearsay is generally not admissible unless it falls within one of the recognized exceptions. Evid.R. 802; *State v. Steffen* (1987), 31 Ohio St.3d 111, 119, 509 N.E.2d 383.

**{¶29}** "The hearsay rule…is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements-the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine-are generally absent for things said out of court." *Williamson v. United States*, 512 U.S. 594, 598,114 S.Ct. 2431, 2434(1994.

**{¶30}** The state argues that the voicemail statement was admissible pursuant to Evid. R. 803, which allows introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition." Testimony that a victim was fearful falls under this hearsay exception and is properly admitted. *State v. Apanovitch*, 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398(1987); *see, also, State v. O'Neal*, 87 Ohio St.3d 402, 411-412, 2000-Ohio-449, 721 N.E.2d 73. However,

> The state-of-mind exception, however, does not permit witnesses to testify to the declarant's statements as to why he or she held a particular state of mind. *State v. Awkal* (1996), 76 Ohio St.3d 324, 331, 667 N.E.2d 960, 967–968, citing *Apanovitch*, 33 Ohio St.3d at 21–22, 514 N.E.2d at 398; see, also, *State v. Frazier* (1995), 73 Ohio St.3d 323, 338, 652 N.E.2d 1000, 1013.

*State v. Tibbetts,* 92 Ohio St.3d 146, 159, 2001-Ohio-132, 749 N.E.2d 226. Thus, the decedent's expression that he was afraid of Smith is admissible; however, the reason he was afraid is not admissible. *State v. Anderson*, 5th Dist. No. 2003CA00349, 2004-Ohio-5474, ¶88.

**{¶31}** In the case at bar, the voicemail statement goes beyond the simple fact that Carter was afraid of Smith. It details an unrelated incident involving a third party. In addition, the record does not disclose at what time of day the incident occurred in relation to the time the voicemail message was recorded. Carter's girlfriend did not recall Carter making a telephone call on March 5, 2011 after the altercation involving Smith. Thus, the question we must address now is whether the admission of the voicemail message was harmless.

**{¶32}** The standard for determining this issue depends upon whether the error involved a non-constitutional violation or was of constitutional magnitude. If there was a constitutional violation, then, in order to consider the errors harmless, we must find that beyond a reasonable doubt the errors did not contribute to the verdict. *State v. Johnson*, 71 Ohio St.3d at 339. Conversely, if the errors were not of a constitutional nature, then they may be deemed harmless so long as there was substantial other evidence to support the guilty verdict. *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023, 1032(1994).

**{¶33}** Under Rule 52(A) of the Ohio Rules of Criminal Procedure, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E. 2d 996, at ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705(1967). "Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id., *citing Chapman* at 23 and *State v. Madrigal*, 87 Ohio St.3d 378, 388, 721 N.E.2d 52.

**{¶34}** In this appeal, Smith argues that the voicemail message contributed to the jury's finding that he purposefully caused the death of Carter. As will be discussed more fully in Smith's fourth assignment of error, evidence of Smith's purpose was admitted, and could be inferred from sources independent of the voice mail message.

{¶35} Smith never denied that he had fired the fatal shot. The evidence indicated that Smith caused the initial confrontation by confronting Carter about Carter's dog. Carter was not on Smith's property at the time. Smith continued his tirade even after Carter had left the sidewalk, crossed the street and was joined by Heskett. Smith informed Carter and Heskett that he was going to get his firearm and "blow them up." There was no evidence that either Carter or Heskett were armed or that anyone ever thought they saw either Carter or Heskett with a weapon. Further, there was no evidence that Carter or Heskett actually attempted to inflict any physical harm on Smith. Nevertheless, the evidence clearly demonstrated that Smith retrieved a firearm from inside his home, returned to the porch and fired in the direction of the two young men, resulting in Carter being fatally wounded. Smith then stole a car and fled the area. Smith initially denied to the police that he had stolen the car. Smith adamantly maintained that he had walked to Berger's house after the shooting. Only after being confronted by the officer at the end of the interview did Smith "come clean" and admit to deciding to steal the car so he could drive home to Kentucky, and upon changing his mind to Berger's home.

{¶36} Carter Baldwin and Terrence Holdren each testified that, as they pulled up to the stop sign at Stewart Avenue and 9th Street, he saw Smith take aim the two young boys who were standing nearby. Baldwin and Holdren indicated that they saw Mr. Smith, with his arms together, holding a gun on the banister, aiming it at one of the kids. Baldwin testified that he believed the man with the gun was aiming at one of the kids.

{¶37} Additionally, the jury having found Smith not guilty of aggravated murder necessarily concluded that Smith did not act with prior calculation and design.

**{¶38}** In the case at bar, we are convinced beyond any reasonable doubt that the jury would have convicted Smith of murder and attempted murder without the voicemail message or any testimony regarding the voicemail message. We find beyond a reasonable doubt evidence of the voicemail message from the decedent did not contribute to the verdicts in Smith's case.

**{¶39}** Smith's first and second assignments of error are overruled.

III.

**{¶40}** In his third assignment of error, Smith challenges the report and opinion of Special Agent Stephen Burk, a crime scene reconstruction expert. Smith argues that the trial court abused its discretion in allowing Agent Burke to testify as an expert regarding the position of the victim and shooter, an opinion that Smith contends is beyond the scope of Agent Burke's training and experience. Smith further contends that Agent Burke's laser sighting tests are mere guesswork and not based upon reliable scientific facts.

**{¶41}** The Bureau of Criminal Identification and Investigation employ special Agent Burke in the major crimes division, crime scene unit. In the case at bar, he utilized a laser that projects a straight line to illustrate the line of sight from Smith's porch. Special Agent Burke testified that a laser is used instead of a length of string to indicate angle and line of sight. He testified that the laser can more accurately span long distances than a string because the string is affected by gravity. The unobstructed line of sight test is used to demonstrate the possibility or the probability that a gunshot could be taken from a certain location.

{¶42} Special Agent Burke obtained blood spatter evidence from the street, which indicted the location of the decedent when he was shot. Special Agent Burke used a tape measure to obtain the distances of the blood spatter and from Smith's porch. Special Agent Burke also photographed a car that had a bullet hole through the rear, passenger side window.

{¶43} The laser test was used in this case because a tree was located between Smith's porch and the street where the blood spatter was found. The test demonstrated a clear unobstructed line of sight between two branches of the tree to the location where the blood spatter began on the sidewalk. A similar test was made from the vehicle to the porch. In addition, a male subject approximating the height and weight of the descendent was placed on the blood spatter. The laser's position on the subject in various positions was demonstrated and photographed.

{¶44} At trial Special Agent Burke was permitted to give his expert opinion that, the shooter would have had a clear unobstructed line of sight from Smith's porch to the damaged car window and through the tree to the area where the blood spatter began. The state also presented photographs of the laser sight demonstration conducted at the scene of the crime.

{¶45} In the case at bar, the Court held a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469(1993) prior to admitting Special Agent Burke's opinion at trial.

In general, courts should admit expert testimony whenever it is relevant and satisfies Evid.R. 702. *State v. Nemeth* (1998), 82 Ohio St.3d 202, 207, 694 N.E.2d 1332; see, also, *State v. Williams* (1983), 4 Ohio

St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444. Thus, the trial judge must perform a "gate keeping" role to ensure that expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. See *Kumho Tire*[(1999)], 526 U.S. [137] at 152, 119 S.Ct. 1167; *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589, 113 S.Ct. 2786; *Nemeth,* 82 Ohio St.3d at 211, 694 N.E.2d 1332; *Douglass,* 153 Ohio App.3d 350, 2003-Ohio-4006, 794 N.E.2d 107, at ¶ 32.

In performing its gate keeping function, the trial court's starting point should be Evid.R. 702, which provides that a witness may testify as an expert if all of the following apply: "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness' testimony is based on reliable, scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply: (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles; (2) The design of the procedure, test, or experiment reliably implements the theory; (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

*Abon, Ltd. v. Transcontinental Ins. Co.*, 5th Dist. No. 2004-CA-0029, 2005-Ohio-3052, *citing Valentine v. Valentine*(2001), 158 Ohio App.3d 615, 628-631 2004-Ohio-4521, 821 N.E.2d 580(2001)(Internal quotation marks omitted).

**{¶46}** Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony." Pursuant to Evid.R. 104(A), the trial court determines whether a witness qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Hartman*, 93 Ohio St.3d 274, 285, 754 N.E.2d 1150(2001); *State v. Williams*, 4 Ohio St.3d 53, 58, 446 N.E.2d 444(1983).

**{¶47}** Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman,* 93 Ohio St.3d at 285; *State v. Baston*, 85 Ohio St.3d 418, 423, 709 N.E.2d 128(1999).

**{¶48}** "A court resolving a reliability question should consider the 'principles and methods' the expert used 'in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible.' *Nemeth*, 82 Ohio St.3d at 210, 694 N.E.2d 1332; see, also, *Miller*, 80 Ohio St.3d 607, 687 N.E.2d 735, paragraph one of the syllabus. As the *Daubert* court stated, in assessing reliability, '[t]he focus * * * must [generally] be * * * on principles and methodology, not on the conclusions that they generate.' *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469.

**{¶49}** "A trial court may not, therefore, exclude expert testimony simply because it disagrees with the expert's conclusions. Instead, if the expert followed methods and principles deemed valid by the discipline to reach his opinion, the court should allow the testimony. See *Paoli*, 35 F.3d at 742 ('an expert's testimony is admissible as long as the process or technique the expert used in formulating the opinion is reliable'). The traditional adversary process is then capable of weeding out those shaky opinions. See *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786, 125 L.Ed.2d 469" *Valentine v. Valentine*, 158 Ohio App.3d 615, 628-631; 2004-Ohio-4521, 821 N.E.2d 580(2001), ¶¶23-31.

**{¶50}** To a certain extent, Special Agent Burke's opinions are cumulative; Smith admitted he fired the gun from his porch and several witnesses observed him. Thus, any error in the admission of the testimony would be harmless. The real crux of Smith's contention is that the tree and the topography of the land could have prevented him from having a clear view of the decedent before he fired depending on where he stood on the porch. Further, Smith argues that he shot wildly and did not aim at either young man.

**{¶51}** In the case at bar, Smith's arguments concerning the use of a laser light instead of a string, and the uncertainty concerning the precise positions of the shooter and the decedent at the time the shots were fired, go more to the weight of the evidence rather than to its admissibility.

**{¶52}** "Questions about the certainty of the scientific results are matters of weight for the jury. For example, in discussing the fact that a hair sampling technique only showed similarities between the hairs and could not show a match with certainty, '[t]he lack of certainty went to the weight to be assigned to the testimony of the expert,

not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight.' *United States v. Brady,* 595 F.2d 359, 363 (6th Cir.1979). And, in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury." *United States v. Bonds*, 12 F.3d 540, 563(6th Cir. 1979). See also, *State v. Pierce*, 64 Ohio St.3d 490, 597 N.E.2d 107(1992).

**{¶53}** Even if we were to assume the admission of this evidence was error, it was harmless beyond a reasonable doubt. Crim.R. 52(A); *State v. Zimmerman*, 18 Ohio St.3d 43, 45, 479 N.E.2d 862, 863(1985). There was no prejudicial error in allowing Special Agent Burke to testify in this case. Agent Burke's testimony did not include conclusions on bullet trajectory. The trial court also instructed the jury to use these demonstrations only for line-of-sight, not as recreations

**{¶54}** Accordingly, Smith's substantial rights were not violated by the admission of Special Agent Burkes testimony.

**{¶55}** Smith's third assignment of error is overruled.

IV.

**{¶56}** In his fourth assignment of error, Smith maintains that his convictions for murder and attempted murder are against the sufficiency of the evidence and against the manifest weight of the evidence, respectively.

**{¶57}** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt." Id.; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶ 146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶ 68.

**{¶58}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id. at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) at 1594.

**{¶59}** When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony. Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v.*

*Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" Id.

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶60}** In the case at bar, Smith challenges his conviction for murder and attempted murder in violation of R.C. 2903.02(A), which states: "No person shall purposely cause the death of another * * *."

**{¶61}** R.C. 2901.22 Culpable mental states, provides:

> (A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶62} In *State v. Jester,* 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968(1987), the Ohio Supreme Court held:

> Where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill. *State v. Clark* (1978), 55 Ohio St.2d 257, 9 O.O.3d 257, 379 N.E.2d 597, *syllabus; State v. Johnson* (1978), 56 Ohio St.2d 35, 10 O.O.3d 78, 381 N.E.2d 637.

*Accord, State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025(1982) (finding purpose to kill in passenger's firing gun at individual from moving vehicle); *State v. Dunlap*, 73 Ohio St.3d 308, 316, 652 N.E.2d 988(1995), *certiorari denied* (1996), 516 U.S. 1096, 116 S.Ct. 1096, 133 L.Ed.2d 765. *State v. Banks,* 10th Dist. No. 01 AP–1179, 2002–Ohio–3341 at ¶ 24.

> The trier of fact may infer an intention to kill from the surrounding circumstances where the natural and probable consequence of a defendant's actions is to produce death. *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517, paragraph five of the syllabus; *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 499 N.E.2d 352. Here, defendant looked at a group of individuals, pointed a semi-automatic handgun in their direction, and fired five shots. In so doing, one of the bullets fired from the handgun struck and killed his driver, Andre J. Bender. Although defendant claims the evidence equally supports a conclusion that he was merely trying to scare individuals in the group by

firing the handgun into the air, "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence." *State v. Brown* (Feb. 29, 1996), Cuyahoga App. No. 68761, unreported. *Compare State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962 (when an inherently dangerous instrumentality is employed in the commission of a robbery, such evidence permits a jury to find a purposeful intent to kill).

*State v. Turner*, 10th Dist. No. 97APA05-709, 1997 WL 798770(Dec. 30, 1997), *quoting State v. Brown*, 8th Dist. No. 68761, 1996 WL 86627(Feb. 29, 1996) *dismissed, appeal not allowed*, 77 Ohio St.3d 1468, 673 N.E.2d 135.

**{¶63}** Smith argues that he was provoked. Smith presented expert testimony to demonstrate that his medications and mental condition could have made him more susceptible to being provoked by those around him. Smith contends that he should have been convicted of voluntary manslaughter.

**{¶64}** The voluntary manslaughter statute, R.C. 2903.03, provides:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another.

**{¶65}** Sudden rage or passion has been described as, "anger, hatred, jealousy, and/or furious resentment." *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488(10th Dist. 1998).

{¶66} To determine whether sufficient evidence of serious provocation exists, a trial court must engage in a two-part inquiry.

{¶67} First, the court must objectively determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. *State v. Mack,* 82 Ohio St.3d 198, 201, 1998-Ohio-375, 694 N.E.2d 1328. "If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage.'" *Id., quoting State v. Shane,* 63 Ohio St.3d 630, 634-35, 590 N.E.2d 724(1992).

{¶68} In examining whether provocation is reasonably sufficient to bring on a sudden fit of passion or fit of rage, the Ohio Supreme Court has stated "[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d at 635, 590 N.E.2d 272. In determining whether the provocation was reasonably sufficient, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time. *State v. Mabry*, 5 Ohio App.3d 13, 449 N.E.2d 16 (8th Dist. 1982), paragraph five of the syllabus, approved.

{¶69} Generally, neither words alone nor fear itself will constitute evidence of serious provocation. "[W]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations" and "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *Shane* at 634-635, 590 N.E.2d 272; *Mack* at 198, 694 N.E. 2d 1328.

{¶70} Unlike self-defense, the issue of who was the aggressor is not the determinative issue in a voluntary manslaughter defense; rather the appellant must

show that he acted under a sudden rage or passion. Further, past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off. *State v. Huertas*, 51 Ohio St.3d 22, 31-32, 553 N.E.2d 1058, 1068-1069 (1990). See, also, *State v. Pierce*, 64 Ohio St.2d 281, 18 O.O.3d 466, 414 N.E.2d 1038 (1980).

{¶71} In the case at bar, as we have already noted, Smith never denied that he had fired the fatal shot. The evidence indicated that Smith caused the initial confrontation by confronting Carter about Carter's dog. Carter was not on Smith's property at the time. Smith continued his tirade even after Carter had left the sidewalk, crossed the street and was joined by Heskett. Smith informed Carter and Heskett that he was going to get his firearm and "blow them up." There was no evidence that either Carter or Heskett were armed or that anyone ever thought they saw either of them with a weapon. Further, there was no evidence that Carter or Heskett actually attempted to inflict any physical harm on Smith. Nevertheless, the evidence clearly demonstrated that Smith retrieved a firearm and fired in the direction of the two young men, resulting in Carter being fatally wounded. Carter Baldwin and Terrence Holdren each testified that, as they pulled up to the stop sign at Stewart Avenue and 9th Street, he saw Smith take aim the two young boys who were standing nearby. Baldwin and Holdren indicated that they saw Mr. Smith, with his arms together, holding a gun on the banister, aiming it at one of the kids. Baldwin testified that he believed the man with the gun was aiming at one of the kids.

**{¶72}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had committed the crimes of murder and attempted murder.

**{¶73}** We hold, therefore, that the state met its burden of production regarding each element of the crime of murder and attempted murder and, accordingly, there was sufficient evidence to support Smith's convictions.

**{¶74}** Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai,* 7th Dist. No. 07 MA 198, 2008–Ohio–6635, ¶ 31, *quoting State v. Woullard,* 158 Ohio App.3d 31, 2004–Ohio–3395, 813 N.E.2d 964, ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, *citing State v. Gore* (1999), 131 Ohio App.3d 197, 201, 722 N.E.2d 125. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter,* 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 118. *Accord, Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

**{¶75}** Addressing Smith's contention that his physical and mental maladies and medications made him more susceptible to being provoked, we note that in *State v. Shane*, the Ohio Supreme Court observed,

A psychologist who testified at trial offered his opinions about Shane's personal propensity to be provoked in the situation as it developed. However, even assuming that Shane subjectively could be easily provoked by Wagner to act under the influence of sudden passion or in a sudden fit of rage, there still must be sufficient provocation by the victim so that a reasonable person would be so provoked. Accepting as fact that Shane was actually provoked only satisfies one part of the provocation inquiry. Because we find that the provocation by the victim in this case was not reasonably sufficient provocation, we hold that the objective portion of the inquiry has not been satisfied. Thus, a reasonable person would not have been provoked in the circumstances of this case.

Hence, we find that the totality of the evidence in this case, even when viewed in a light most favorable to the defendant, did not raise a possibility of serious provocation. Shane alleges that it was only mere words that provoked him. Considering this fact, together with the surrounding circumstances of the case, we conclude that no reasonable jury could have decided that Shane was sufficiently provoked by the victim so that a conviction on the inferior-degree offense of voluntary manslaughter could have been forthcoming.

63 Ohio St.3d 638.

**{¶76}** In the case at bar, we find that any provocation by the victims in this case was not reasonably sufficient to provoke a reasonable person to use deadly force. There was no evidence that either Carter or Heskett were armed or that anyone ever thought they saw either of them with a weapon. Further, there was no evidence that Carter or Heskett actually attempted to inflict any physical harm on Smith. Thus, the objective portion of the inquiry has not been satisfied.

**{¶77}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, *quoting Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury was in the best position to evaluate this competent, credible evidence, and we will not substitute our judgment for that of the trier of fact. The jury neither lost their way nor created a miscarriage of justice in convicting Smith of the charges.

**{¶78}** Smith's fourth assignment of error is overruled.

V.

**{¶79}** In his fifth assignment of error, Smith asserts that the cumulative effect of the errors alleged in his previous assignments of error warrant a reversal. We disagree.

**{¶80}** Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error. *State v. Garner* 74 Ohio St.3d 49, 64, 656 N.E.2d 623(1995), *certiorari denied* (1996), 517 U.S. 1147, 116 S.Ct. 1444, 134 L.Ed.2d 564. *Accord, State v. Brown,* 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506.

**{¶81}** This Court has found that if the trial court did not err cumulative error is simply inapplicable. *State v.* Carter, 5th Dist. No. 2002CA00125, 2003-Ohio-1313 at ¶ 37. To the extent that we have found that any claimed error of the trial court was harmless, or that claimed error did not rise to the level of plain error, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard,* 104 Ohio St.3d 54, 89-90, 2004-Ohio-6235, 818 N.E.2d 229, 270 at ¶ 185.

**{¶82}** As this case does not involve multiple instances of error, Smith's fifth assignment of error is overruled.

**{¶83}** The judgment of the Court of Common Pleas, Guernsey County, Ohio, is affirmed.

By Gwin, P.J.

Hoffman, J., and

Wise, J., concur

_____
HON. W. SCOTT GWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. JOHN W. WISE

WSG:clw 0301

[Cite as *State v. Smith*, 2013-Ohio-1226.]

IN THE COURT OF APPEALS FOR GUERNSEY COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| MICHAEL P. SMITH | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2012-CA-17 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, Guernsey County, Ohio, is affirmed.  Costs to appellant.

_____
HON. W. SCOTT GWIN


_____
HON. WILLIAM B. HOFFMAN


_____
HON. JOHN W. WISE