# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106462**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# RAVONTE CARTER

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-613373-A

**BEFORE:** Keough, J., E.T. Gallagher, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** September 13, 2018

[Cite as *State v. Carter*, 2018-Ohio-3671.]
**ATTORNEY FOR APPELLANT**

Timothy F. Sweeney
The 820 Building, Suite 430
820 West Superior Avenue
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Carl Mazzone
        Andrew J. Santoli
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

**{¶1}** Defendant-appellant Ravonte Carter appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of murder and felonious assault and sentencing him to 18 years to life in prison. For the reasons that follow, we affirm.

## I. Background

**{¶2}** In January 2017, Carter was charged in a four-count indictment as follows: Count 1, aggravated murder in violation of R.C. 2903.01(A); Count 2, murder in violation of R.C. 2903.02(B); Count 3, felonious assault in violation of R.C. 2903.11(A)(2), and Count 4, felonious assault in violation of R.C. 2903.11(A)(1). The charges stemmed from the shooting and death of Donovan Alexander on December 22, 2016, at Jolly's Place, a bar located on the corner of Hulda Avenue and East 110th Street on Cleveland's east side. Carter pleaded not guilty and the case proceeded to a jury trial.

**{¶3}** Alyson Widen testified that she lives across the street from Jolly's Place and called 911 at approximately 11 p.m. on December 22 to report gunshots at Jolly's. The jury listened to Widen's 911 call, in which she reported that she had seen two men arguing in what appeared to be a "standoff" and heard five quick gunshots and later two more.

**{¶4}** Dominic Alexander, Donovan's brother, testified that he and Carter grew up in the same neighborhood, and their families knew each other. Dominic said that he and others in the neighborhood knew Carter as Lil Ru or Vito.

{¶5}   Dominic testified that he and Donovan arrived at Jolly's at approximately 5:30 p.m. on December 22, and he set up his equipment to DJ for a birthday party that evening.   People began arriving around 6:30 p.m.; Dominic  said he and his brother knew almost everyone in the bar that night because it was a neighborhood gathering place.

{¶6}   Around 9:30 p.m., Dominic went outside to smoke and saw Donovan standing outside.  Dominic said that as he and Donovan stood outside near a stop sign mounted on a telephone pole in front of Jolly's, smoking and talking with other people, he saw Carter come from the empty field on East 110th Street across the street from Jolly's and approach Donovan.  Dominic testified that Carter grabbed Donovan's arm and told him he wanted to talk to him, but Donovan pushed him off and told him to leave him alone.  Dominic said that Carter was angry, and the two men began "having words with each other."

{¶7}   Dominic testified that Sierra Mason, a close friend of the family who was standing outside with Donovan, tried to calm Donovan down.  Dominic said that other people from the neighborhood got between Carter and Donovan, trying to calm them down, and Reginald Jolly, the bar owner, grabbed Carter and tried to push him away. Dominic then saw Carter pull out a chrome semi-automatic gun and shoot four or five shots towards Donovan, "right past the owner of the bar."  Dominic saw Donovan run into the bar and Carter run down East 110th Street toward Shale Avenue.  Dominic said

that he heard two or three more gunshots after he ran into the bar but did not know who was shooting.

{¶8} Dominic testified that prior to his death, Donovan told him about an incident that occurred in August 2015 and created "bad blood" between Carter and Donovan. Dominic testified that he believed this incident led to the shooting.

{¶9} Dominic testified that he did not have a firearm on his person that evening and did not observe anyone other than Carter fire a gun that evening. The police arrived only a few minutes after the shooting, and Dominic identified Carter as the shooter. Later that night, Dominic picked Carter out of a photo array, stating that he was "100 percent" sure of his identification.

{¶10} Dominic identified state's exhibit No. 228 as a sketch he drew for the police that evening indicating where Dominic and Carter were standing when the shooting occurred. The drawing reflects that Donovan was standing in front of the stop sign, and Carter was standing a short distance away on East 110th Street, in a southeasterly direction from Donovan.

{¶11} Dominic gave the police on the scene permission to search his Impala, which was parked next to Jolly's on the sidewalk on East 110th Street. The police found a handgun in Dominic's car, which Dominic testified did not belong to him. The police performed a gunshot residue test on Dominic that evening; he testified that he learned only three weeks prior to trial that the result was positive.

{¶12} Andre Hobbs testified that Donovan was his cousin, and that he, Donovan, and Carter, who he knew as Vito, grew up in the same neighborhood. Hobbs testified that he rode to Jolly's on December 22, 2016, with Dominic and Donovan and that during the ride, he saw a gun on the floor of the passenger side of the car that he thought belonged to Donovan.

{¶13} Hobbs said that he sat in the DJ booth when Dominic and Donovan went outside to smoke. He testified that a little later, he saw Donovan run into the bathroom of the bar, and he followed him inside. He saw Donovan sitting on the toilet, breathing heavily, and asked him what was wrong. When Donovan replied, "He shot me," Hobbs asked "Who?" Hobbs testified that Donovan replied, "Vito," lifted up his shirt, showed him the bullet wound, and then passed out. Hobbs identified Dominic and himself on state's exhibit No. 231, police body camera video from Cleveland police officer Brandon Melbar, who responded to the scene minutes after the shooting. Dominic can be seen on the video shouting that Vito shot his brother.

{¶14} Hobbs also testified about an incident that happened in September 2015, at his residence. Hobbs said that at about 2:00 a.m. one morning, he heard someone banging on the front door. When Hobbs asked from an upstairs window who was there, the person replied, "Vito." Hobbs said that when he asked Vito what he wanted, Vito replied, "Tell your brother to give me my gun." Hobbs replied that he did not know what Vito was talking about, got dressed, and went downstairs. He said that by the time he came downstairs, his mother was talking to Vito, who Hobbs could see through the front

door. Hobbs said that his mother told Vito that Donovan was not her son and did not live at that house, but Vito replied, "If Don don't give me my gun, I'm going to get my other gun and I'm coming back and shooting this house up." Hobbs said that his mother immediately called the police. State's exhibit No. 210, the 911 call placed by Hobbs's mother, was played for the jury. In the call, Hobbs's mother states that she told the man he had the wrong house, but he told her he wanted his gun and if he did not get it, he was going to come back and "light this whole house up."

{¶15} Hobbs testified that his brother and Donovan looked alike and frequently hung out together, which could have been why Vito thought Donovan was Hobbs's brother. Hobbs testified further that he later learned from Donovan about an earlier incident between Carter and Donovan that led to the incident at his house.

{¶16} Sierra Mason testified that she grew up with Dominic, Donovan, and Carter, who she knew as Lil Ru or Vito. Mason said that she went to Jolly's on December 22, 2016, to celebrate a friend's birthday. She saw Carter come into the bar about 45 minutes after she arrived, and later noticed that he had left.

{¶17} Mason said that she smoked and talked with Donovan in the bar for awhile, and he then went outside. She testified that when he had not returned after 15 minutes, she went outside to look for him. She said that there were three cars parked on the sidewalk next to the bar: a Saab closest to the door, then a Cadillac, and behind the Cadillac, an Impala near a gate to a fenced-in area at the back of the bar. Mason said that when she walked out, she saw Reginald Jolly standing by the gate in front of Carter,

holding him back. Mason said that she saw Donovan walking toward her from back by the gate, and heard him yelling and cussing about Carter. Mason testified that she walked toward Donovan, and pulled on him, trying to convince him to go back inside the bar.

{¶18} Mason said that she and Donovan walked between the Cadillac and the Saab toward the street, and stopped near the telephone pole at the corner; Mason said she was in the street; Donovan was on the curb. She then saw Carter, who had been standing between the Saab and Cadillac, walk into the middle of the street. Mason said she again urged Donovan to go back in the bar, but as she looked back at Carter, she saw him pull out his gun and point it. Mason testified that Donovan immediately pushed her down, and she fell to the ground, where she curled up in a fetal position. She said that she heard five or six quick shots, after which she saw Carter run towards Shale Avenue. Mason testified that she did not see or hear anyone else shooting that evening.

{¶19} Mason said that when she went back in the bar, people told her that Donovan had been shot. Mason said that she went into the bathroom, saw Donovan sitting on the toilet, and heard him say he had been hit twice. She said that Andre asked him "Who?", and Donovan responded, "Vito."

{¶20} Reginald Jolly testified that when he walked outside Jolly's the evening of December 22, 2016, he immediately heard a "small commotion" but did not know what it was about. He said that he walked around the telephone pole and when he reached the front of the Saab, he saw Carter, who was standing on East 110th Street near the front of

the Cadillac, pull a gun out of his pants. Jolly said that when he turned his head to see why Carter was pulling out a gun, he heard gunshots that sounded like they went by his head. He then saw Carter run down the street. Jolly testified that although he did not see Carter pull the trigger, he did not see anyone else with a gun that evening.

{¶21} Jolly testified that he finds old shell casings outside his bar every week, and that he told the police on the scene that evening that the casings they found were probably old. Later that evening, Jolly identified Carter in a photo array as the shooter, and told the police he was "100 percent" sure of his identification.

{¶22} On cross-examination, Jolly said that he did not see Donovan outside the bar that night, and denied that he told police officers on the scene that Donovan had been standing in the area outside the bar where shell casings were found. Jolly admitted that he gave a statement to police in April 2017, but denied that he told the police that "there were a lot of people on the side of the building with guns" and that there were two people behind him with guns.

{¶23} Paramedic Stacie Nofer testified that she responded to Jolly's within four minutes after the 911 call came in. She testified that she observed Donovan slumped over on the toilet, barely breathing. Nofer testified that Donovan was unconscious both at the scene and during the trip to University Hospitals, and that he went into cardiac arrest, and later died, as the paramedics transferred his care to UH personnel at the hospital.

{¶24} Brandon Melbar was one of several police officers who responded to the scene within three to four minutes of the 911 call. Melbar said he and his partner secured the area with caution tape, but said the scene was chaotic and nearly 50 people were milling around inside and outside the bar. Melbar identified state's exhibit No. 241 as video from his body camera at the scene.

{¶25} Melbar said that he interviewed Dominic at the scene and learned that the shooter's name was Lil Ru. Melbar also spoke with the bartender, who told him that Donovan did not have a gun and that a second volley of shots occurred while Donovan was in the bathroom.

{¶26} Cleveland Police Officer James Thomas also responded to Jolly's after the 911 call. Thomas testified that he was advised while on the scene that there had been another shooting nearby on Shale Avenue but the police never found a link between the two shootings.

{¶27} Thomas testified that the police found eight shell casings in front of the door to Jolly's, as well as a live bullet in the street near the front of Cadillac. He testified that Jolly told him that the shooter was near the Cadillac at some point during the shooting, and that Donovan was shot in front of the bar where the casings were found. Officer Thomas said that the shots that killed Donovan did not come from near the Cadillac because no spent shell casings were found there. He testified that the officers on the scene believed that the shooter's gun likely malfunctioned when the shooter was by the

Cadillac, and the shooter then cleared the malfunction, ejecting the live bullet that was found near the Cadillac.

{¶28} Ballistics testing conducted on the eight shell casings retrieved from the crime scene demonstrated that the casings were from two different guns. Five of the shell casings — those located on the sidewalk close to the bar door — were fired from the same 9 mm pistol. The other three shell casings — recovered from the street in front of the telephone pole — were fired from a different 9 mm pistol. None of the casings matched the morgue pellet recovered from Donovan's body, and none of the casings were fired from the guns retrieved from Dominic or Reginald. Likewise, DNA testing conducted on the eight casings revealed no statistical match to Carter or to Donovan. Gunshot residue tests on Dominic and Donovan's hands were positive.

{¶29} The jury found Carter not guilty of Count 1, but guilty of Counts 2 through 4, and the accompanying firearm specifications. At sentencing, the parties agreed that Counts 3 and 4 were allied offenses of Count 2, and the state elected to sentence on Count 2. The trial court sentenced Carter to 15 years to life on Count 2, and three years on the firearm specification, to be served consecutively, for a total sentence of 18 years to life. This appeal followed.

## II.  Law and Analysis

### A.    Dying Declaration

{¶30} The trial court admitted the hearsay statements made by Donovan to Hobbs, and overheard by Mason, when Donovan told Hobbs in the bathroom immediately after

the shooting that Vito shot him. Defense counsel did not object to Hobbs's testimony about what Donovan told him, but objected when Mason testified about Donovan's statement. The trial court overruled the objection and allowed the hearsay statement as a dying declaration. In his first assignment of error, Carter contends that Donovan's statement was not a dying declaration, and that by allowing the statement, the trial court violated his constitutional right to confront the witnesses against him.

{¶31} The Sixth Amendment of the U.S. Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a testimonial out-of-court statement of a witness who does not appear at trial violates the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. However, although not admissible under a hearsay exception, such testimonial statements may be admissible under one of the two historical exceptions to the Confrontation Clause recognized by the U.S. Supreme Court: forfeiture by wrongdoing (when the defendant engaged in conduct designed to keep the witness from testifying) and dying declarations. *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).

{¶32} A dying declaration is "a statement made by a declarant while believing his death is imminent, concerning the cause or circumstances of what he believed to be his impending death." Evid.R. 804(B)(2). To be admissible as a dying declaration,

evidence must show that the deceased's statements were made under a sense of impending death that excluded from the declarant's mind all hope or expectation of recovery. *State v. Woods*, 47 Ohio App.2d 144, 147, 352 N.E.2d 598 (9th Dist.1972); *Robbins v. State*, 8 Ohio St. 131 (1857). "The state of mind of the declarant at the time of his declarations is decisive." *State v. Ross*, 7th Dist. Mahoning No. 96 CA 247, 1999 Ohio App. LEXIS 4859, *12 (Oct. 12, 1999). Although a court may infer "despair of recovery" if the facts support the inference, "the severity of the victim's wounds cannot be used in and of itself as sufficient evidence that the victim was aware of impending death and had lost all hope of recovery." *State v. Everson*, 7th Dist. Mahoning No. 12 MA 128, 2016-Ohio-87, ¶ 12.

{¶33} Carter contends that Donovan's statements to Hobbs were improperly admitted as a dying declaration because "there was no evidence that would allow for even an inference" that Donovan believed that he was about to die from his wounds. We agree, but nevertheless conclude that the statements were properly admitted.

{¶34} The Confrontation Clause does not bar the admission of hearsay statements that are not testimonial. *Davis v. Washington*, 547 U.S. 813, 823, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21. Indeed, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all and need not be considered. *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007).

{¶35} Although it has not defined "testimonial," in *Crawford*, the U.S. Supreme Court stated generally that the core class of statements implicated by the Confrontation Clause includes statements "made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. The Court found that at a minimum, testimonial evidence includes prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and statements made during police interrogations. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 144, citing *Craword* at 68.

{¶36} The Court subsequently clarified that statements made during a police interrogation are nontestimonial if made under circumstances indicating the purpose of the interrogation is to assist the police with an ongoing emergency. *Davis v. Washington*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. Statements to law enforcement are testimonial where there is no ongoing emergency and the primary purpose of the interrogation is to establish past events for later prosecution. *Id.*

{¶37} Donovan's statements to Hobbs do not involve prior court testimony or a police interrogation. Therefore, to resolve the Confrontation Clause question, we look to *State v. Stahl*, 114 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, which sets forth the applicable test. *Jones* at ¶ 160.

{¶38} In *Stahl*, the Ohio Supreme Court adopted the objective-witness test for out-of-court statements made to a non-law enforcement person. The court explained that

such a statement is testimonial for Confrontation Clause purposes if an objective witness would have reasonably believed that the statement would be available for use at a later trial. *Id.* at paragraph one of the syllabus. The focus is on "'the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations.'" *Id*. at paragraph two of the syllabus.

{¶39} Here, Donovan's statements to Hobbs are not testimonial because an objective witness under the same circumstances would not have reasonably believed the statements would be used later for trial. The statements were made immediately after the shooting, while Donovan was in the bathroom of the bar, barely conscious, and as he reported his injuries and what happened to his cousin and friend. In such circumstances, the statement is not testimonial. *See Jones*, 135 Ohio St.3d at ¶ 162, 2012-Ohio-5677, 984 N.E.2d 948 (wife's hysterical statement to friend that husband told her he killed a woman not testimonial); *State v. Smith*, 5th Dist. Guernsey No. 2012-CA-17, 2013-Ohio-1226 (decedent's voicemail message to friend about his fear of defendant not testimonial); *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 38 (victim's statements to friend and therapist about her fear of defendant's volatile behavior and outbursts not testimonial); *State v. Peeples*, 7th Dist. Mahoning No. 07 MA 212, 2009-Ohio-1198, ¶ 31 (statement to friend not testimonial because objective witness would not reasonably believe statement would later be used at trial.). *See also Williams v. Adams*, 447 Fed. Appx. 829, 831 (9th Cir.2011) (statement made by victim to his wife

identifying shooter immediately after the shooting while the victim was in critical condition not testimonial); *United States v. Franklin*, 415 F.3d 537, 545 (6th Cir.2005) (statements made to friend and confidant not testimonial for Confrontation Clause purposes); *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177 ("[A] formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")

**{¶40}** Because Donovan's statements are not testimonial, they are admissible if they fall within a hearsay exception under the evidence rules. We conclude they fall under Evid.R. 803(2), which allows introduction of an excited utterance. To fall within the excited utterance exception, four elements must be satisfied: (1) a startling event; and (2) a statement relating to that event; (3) made by a declarant with firsthand knowledge; (4) while the declarant was under the stress of the excitement caused by the event. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123.

**{¶41}** Donovan's statements to Hobbs identifying Carter as the shooter met the requirements for admissibility as an excited utterance. The shooting was a startling event, Donovan obviously had firsthand knowledge of the shooting, his statements related to the shooting, and the statements were made while he was still under the stress of the excitement caused by the shooting. Thus, the statements qualified as an excited utterance under Evid.R. 803(2). Furthermore, the statements met the requirement for relevancy under Evid.R. 401. Accordingly, the statements were properly admitted into evidence, and the first assignment of error is therefore overruled.

## B. Other Acts Evidence

**{¶42}** In his second assignment of error, Carter contends that the trial court committed prejudicial error by admitting "other acts" evidence concerning the prior dispute between him and Donovan. Carter concedes that the state introduced evidence of the prior dispute as proof of a motive to kill Donovan, but contends that the evidence was nevertheless improperly admitted.

**{¶43}** "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, there are exceptions that allow other acts of wrongdoing to be admitted.

**{¶44}** R.C. 2945.59 provides that:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶45}** In addition, Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.

**{¶46}** In deciding whether to admit other acts evidence, trial courts should conduct a three-step analysis:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

**{¶47}** Applying this test to the challenged testimony, we find no abuse of discretion by the trial court in admitting the evidence. The other acts evidence was relevant because it tended to show why Carter shot Donovan. Although neither Dominic nor Hobbs testified as to what occurred during the earlier incident, they both testified they were aware of an incident between the two men that they believed led to the shooting. Dominic specifically testified that the earlier incident created "bad blood" between Carter and Donovan. The testimony was therefore admitted for a legitimate purpose under Evid.R. 404(B), which provides that other acts evidence may be admitted to show motive. Dominic and Hobbs's testimony was relevant to Carter's motive for shooting Donovan.

**{¶48}** And despite Carter's arguments otherwise, the probative value of the evidence was not outweighed by the danger of unfair prejudice. The trial court carefully limited Donovan and Hobbs's testimony about the prior incident. It did not permit them to testify as to what the initial incident involved because neither had any firsthand

knowledge of the incident. Moreover, it did not allow the state to establish why 15 months elapsed between the incident at Hobbs's house and Donovan's shooting because evidence that Carter was incarcerated shortly after the September 2015 incident was inadmissible.

{¶49} Nevertheless, Carter argues that Hobbs should not have been allowed to testify about the incident that occurred at his house in September 2015 because that incident had no relationship to Donovan's murder. He contends that Carter was looking for Hobbs's brother, not Donovan, that morning and, in any event, there was no evidence that Carter did anything in the year after that incident to carry out his threats. Carter's arguments have no merit.

{¶50} Carter was not looking for Hobbs's brother that morning; he was looking for Donovan, who he believed to be Hobbs's brother and who he apparently thought lived at that address. As demonstrated on the 911 call made by Hobbs's mother, Carter threatened to "light the place up" if Donovan did not return his gun. Thus, the incident was related to Donovan's murder. And there was no testimony about what Carter did in the year after the incident because he was incarcerated, an inadmissible fact that was not presented to the jury precisely because it would have been unfairly prejudicial to Carter.

{¶51} A trial court's decision to admit other acts evidence is within the trial court's discretion, and will not be reversed absent an abuse of that discretion. *State v. Green*, 90 Ohio St.3d 352, 369, 738 N.E.2d 1208 (2000). Finding no abuse of discretion in the trial

court's decision to admit the other acts evidence, the second assignment of error is overruled.

## C. Limiting Instruction

{¶52} In his third assignment of error, Carter contends that even if it was not error to admit the other acts evidence, the trial court erred in not giving the jury a limiting instruction that the other acts evidence could only be considered for the limited purpose of whether it was a motive for Carter's actions on December 22, 2016, and could not be considered as evidence that Carter had a bad character and acted in conformity with that character on December 22, 2016.

{¶53} Carter did not request that the trial court give a limiting instruction, and his failure to do so waives all but plain error. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 136. Where the defense fails to request a limiting instruction on other acts evidence, the trial court's failure to give such an instruction is not plain error where nothing suggests the jury used other acts evidence to convict the defendant because he was a bad person. *Id.* Carter points to nothing that suggests the jury did so. Accordingly, we find no plain error in the trial court's failure to give a limiting instruction. The third assignment of error is overruled.

## D. Felony Murder

{¶54} Carter was convicted in Count 2 of felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of

violence that is a felony of the first or second degree and that is not [voluntary or involuntary manslaughter]." The underlying felony for Carter's felony murder conviction was felonious assault in violation of R.C. 2903.02, which provides that "no person shall knowingly cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

**{¶55}** In his fourth assignment of error, Carter contends that his conviction for felony murder with the predicate offense of felonious assault is unconstitutional because it violates the independent-felony/merger doctrine. The doctrine recognizes that an offender should be convicted of felony murder only if the collateral, or predicate, felony offense was independent of the lethal act. Carter urges this court to adopt the doctrine.

**{¶56}** Carter concedes, however, that Ohio appellate courts, including this one, do not recognize the doctrine. *State v. Franks*, 8th Dist. Cuyahoga No. 103682, 2016-Ohio-5242, ¶ 15; *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 107, *appeal not accepted*, 138 Ohio St.3d 1449, 2014-Ohio-1182, 5 N.E.3d 667, citing *State v. Mays*, 2d Dist. Montgomery No. 24168, 2012-Ohio-838, ¶ 8; *State v. Pickett*, 1st Dist. Hamilton No. C-000424, 2001-Ohio-4022; *State v. Hayden*, 11th Dist. Lake No. 99-L-037, 2000 Ohio App. LEXIS 3198 (July 14, 2000). We need not revisit our rejection of the independent-felony/merger doctrine based solely on Carter's citation to other jurisdictions that apply the doctrine, although we acknowledge that Carter may be simply preserving the argument for further review. *Franks* at *id.* The fourth assignment of error is overruled.

**E.      Jury Instruction on Lesser Included or Inferior Degree Offenses**

{¶57} In his fifth assignment of error, Carter contends that the trial court erred by not instructing the jury in Count 2 on involuntary manslaughter, a lesser-included charge of murder, and on aggravated assault, an inferior offense of felonious assault, with which Carter was charged in Counts 3 and 4.

{¶58} Carter failed to request instructions on involuntary manslaughter or aggravated assault and thus has waived all but plain error. For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. Notice of plain error "is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108.

{¶59} A charge on a lesser included or inferior offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included or inferior offense. *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. In determining whether lesser included or inferior offense instructions are appropriate, the trial court must view the evidence in the light most favorable to the defendant. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37. Nevertheless, the lesser included or inferior offense instruction is not warranted every time "some evidence" is presented to support the lesser offense. *State v. Shane*, 63 Ohio St.3d 630,

632, 590 N.E.2d 272 (1992). Rather, a court must find sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser included or inferior offense. *Id.* at 632-633.

{¶60} R.C. 2903.12(A), which defines aggravated assault, states that:

No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly: (1) cause serious physical harm to another or to another's unborn; (2) cause of attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance, as defined in [R.C. 2923.11].

{¶61} Aggravated assault is an inferior degree offense of felonious assault because it contains identical elements to those defining felonious assault, except for the additional mitigating element of serious provocation. *State v. Deem*, 40 Ohio St.3d 205, 210, 533 N.E.2d 294 (1988). In a trial for felonious assault, an instruction on aggravated assault must be given to the jury if the defendant presents sufficient evidence of serious provocation. *Id.* Involuntary manslaughter is a lesser included offense of murder. *State v. Brown*, 9th Dist. Summit No. 20662, 2002 Ohio App. LEXIS 91, *12 (Jan. 16, 2002), citing *Thomas* at 215 and *State v. Rohdes*, 23 Ohio St.3d 225, 492 N.E.2d 430 (1986). Carter acknowledges that he was acquitted of aggravated murder charged in Count 1 (thus any alleged error regarding that jury instruction is moot), but contends that the jury should have been instructed on involuntary manslaughter and aggravated assault regarding Counts 2, 3, and 4.

**{¶62}** Count 2 charged felony murder in violation of R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not [voluntary or involuntary manslaughter]." Involuntary manslaughter under R.C. 2903.04(A), defined as "no person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony," is almost identically worded but expands the definition to include *any* felony offense, instead of limiting the predicate crime to a first- or second-degree felony offense of violence. Thus, Carter contends the jury should have been instructed on involuntary manslaughter, with aggravated assault as the predicate offense. We disagree, because the record lacks any evidence that Carter was provoked to shoot Donovan.

**{¶63}** The evidence was clear that Carter initiated the confrontation: he approached Donovan on the street outside Jolly's and grabbed his arm. According to Dominic, Carter was already angry, and after he grabbed Donovan's arm, the men began "having words with each other." There was testimony that Donovan insulted Carter using vulgar language. Words alone, however, will not constitute reasonably sufficient provocation to incite the use of force in most situations. *Shane*, 63 Ohio St.3d at 637, 590 N.E.2d 272. There was no evidence that Donovan physically threatened Carter, or that he pulled out a gun.

**{¶64}** Rather, the evidence established that although people got between Carter and Donovan and tried to calm them down, Carter pulled out a gun and shot Donovan.

Although Carter speculates that there were multiple shooters, all of the witnesses to the shooting testified that he was the only individual who pulled out a gun. Furthermore, although the police found multiple shell casings from multiple guns at the scene, which Carter argues supports the multiple-shooter theory, Reginald Jolly testified that he finds shell casings on the ground outside his bar every week, and that the casings found by the police were likely already there before the shooting. Moreover, although the gun residue tests on Donovan and Dominic were positive, there was evidence that one can test positive for gun shot residue by being in close proximity to gunfire.

{¶65} In short, we find no evidence to support Carter's assertion that the jury could have reasonably concluded that he was provoked to shoot that night. Rather, in light of the incident that occurred in August 2015, the evidence demonstrated that Carter still carried a grudge against Donovan that he had apparently not gotten over more than a year later.

{¶66} Without any evidence of serious provocation, no jury could reasonably conclude that the evidence in this case supported an acquittal on the felony murder charge and a conviction for involuntary manslaughter with aggravated assault as the underlying felony, or that the felonious assault charges were merely aggravated assault. *Brown*, 9th Dist. Summit No. 20662, 2002 Ohio App. LEXIS 91 at *14. Accordingly, we find no plain error in the trial court's failure to instruct on these offenses; the fifth assignment of error is therefore overruled.

## F.     Ineffective Assistance of Counsel

{¶67} In his sixth assignment of error, Carter asserts that he was denied his Sixth Amendment right to effective assistance of counsel because his counsel failed to (1) request jury instructions on involuntary manslaughter and aggravated assault (the fifth assignment of error); (2) request a limiting instruction with respect to Dominic and Hobbs's testimony about the prior incident between him and Donovan (the third assignment of error); and (3) object to Hobbs and Mason's testimony regarding Donovan's statements to them about who shot him (the first assignment of error).

{¶68} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 20152 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case, and it must give great deference to counsel's performance. *Id*. at 689. Trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Gooden*, 8th Dist. Cuyahoga No. 88174, 2007-Ohio-2371, ¶ 38, citing *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶69} As discussed above, Donovan's statements to Mason and Hobbs regarding who shot him were properly admitted under the hearsay exception for excited utterances. Thus, counsel was not ineffective for not objecting to this testimony. Further, because there was no evidence to support jury instructions on involuntary manslaughter and aggravated assault, trial counsel was not ineffective for not requesting such instructions. Finally, because there was no evidence to suggest the jury improperly used Dominic and Hobbs's testimony about the prior incident between Carter and Donovan (other acts evidence) to convict Carter because he was a bad person, Carter has failed to demonstrate that he was prejudiced by counsel's failure to request a limiting instruction regarding the testimony. Accordingly, the sixth assignment of error is overruled. **G. Manifest Weight of the Evidence**

{¶70} Last, Carter contends that his convictions were against the manifest weight of the evidence. A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the

manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶71}** Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weigh of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

**{¶72}** Carter contends that the jury lost its way in convicting him because he did not shoot or kill Donovan. He contends that the physical evidence at the scene, Jolly's statements to police that there were multiple shooters that night, the 911 call about a "standoff," and "common sense," prove that a melee developed near the front of the bar, that multiple shots were fired by multiple shooters, and that Donovan was struck. He further contends that the witnesses, who were friends of or related to Donovan, gave biased and contradictory testimony.

{¶73} This is not the extraordinary case where the evidence weighs so heavily against the conviction that a new trial must be ordered. All three eyewitnesses to the shooting — Dominic, Mason, and Jolly — described the same scene. They all testified that during the altercation, Jolly was in front of Carter when he pulled out a gun. Dominic and Mason saw Carter shoot; Jolly said that as he turned his head to see why Carter had pulled out his gun, he heard the shots go by his head. These witnesses all testified that Carter was the only individual who pulled a gun out that evening.

{¶74} Carter contends that the evidence was contradictory regarding where he was standing when the shots were fired, and that he could not have shot from near the Cadillac, where Jolly said he was standing, because no spent shell casings were found there. He also asserts that it would have been impossible for him to have shot over the Cadillac and hit Donovan, who was standing by the telephone pole. But state's exhibit No. 228, a sketch Dominic drew for the police that evening indicating where Donovan and Carter were standing when the shooting happened, showed that Carter was standing in the street. Mason and Jolly likewise testified that Carter was standing in the street when he pulled out his gun. Furthermore, although Jolly testified that Carter had to shoot over the Saab because he was standing in front of the Cadillac, he clarified on redirect that Carter was standing on East 110th Street when he pulled out his gun. And police officer Thomas testified that Jolly told him that evening that the shooter was by the Cadillac where the live round was found "at some point" but that the shooting occurred in front of the bar where the casings were found. The jury could have reasonably

concluded from this evidence that Carter was standing in the street when he shot Donovan, in a direction from which he could aim and hit Donovan.

{¶75} Carter also argues that his conviction was against the manifest weight of the evidence because none of the shell casings matched the bullet recovered from Donovan's body. But Jolly told the police immediately after the shooting that the shell casings on the ground were probably old because he found old casings outside the bar every week.

{¶76} Furthermore, the evidence demonstrated that more than 50 people were milling around in and outside the bar when the police arrived. Officer Thomas testified that it was difficult to secure the scene because there were so many people walking around outside, and that the police finally put a bar stool in front of the door to Jolly's to keep people from walking through the area where the shell casings were found. Officer Melbar likewise testified that the scene was chaotic when the police arrived, and that it was possible that evidence on the ground had been moved around because of the large number of people milling around outside the bar.

{¶77} Carter's argument that his convictions are against the manifest weight of the evidence because there were multiple shooters that evening and he was provoked to shoot Donovan is based on mere conjecture. The jury heard the inconsistencies in the testimony and resolved them accordingly. This is not the exceptional case where the evidence weighs heavily against the convictions and the jury lost its way. The assignment of error is overruled.

{¶78} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

EILEEN T. GALLAGHER, P.J., and
SEAN C. GALLAGHER, J., CONCUR