[Cite as *State v. Nelson*, 2022-Ohio-4499.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 2021CA00130 |
| | : | |
| RICHARD JAMES NELSON | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Stark County Court of
                                  Common Pleas, case no. 2021CR0856



JUDGMENT:                         AFFIRMED



DATE OF JUDGMENT ENTRY:           December 13, 2022



APPEARANCES:


For Plaintiff-Appellee:                    For Defendant-Appellant:

KYLE L. STONE                              TY A. GRAHAM
STARK CO. PROSECUTOR                       4450 Belden Village St. NW
TIMOTHY E. YAHNER                          Suite 703
110 Central Plaza South, Ste. 510          Canton, OH 44718
Canton, OH 44702-1413

*Delaney, J.*

{¶1} Appellant Richard James Nelson appeals from the October 25, 2021, Judgment Entry of the Stark County Court of Common Pleas. Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2} This case arose on April 16, 2021, when R.R. was murdered at her workplace in Canton, Ohio, by her ex-boyfriend, appellant. The following facts are adduced from the record of appellant's jury trial.

*Carl Andrews takes appellant's call on R.R.'s phone*

{¶3} As of April 16, 2021, Carl Andrews had been dating R.R. for several weeks, and R.R. spent the night at his house on the evening of April 15, 2021. The next day, the couple arose around 7:00 a.m. because R.R. had to work at the Canton Bob Evans location at 8:00 a.m. R.R. told Carl there were 99 missed calls on her cell phone from her ex-boyfriend, "Chillie Mo," later identified as appellant. Carl saw the record of missed calls on R.R.'s phone.

{¶4} As Carl looked at the phone, yet another call came in from "Chillie Mo." Carl answered and a man on the other end began yelling at him. Carl told the man that R.R. had moved on and didn't want to speak to him, which escalated the argument. During the call, the man mentioned an STD. Carl ended the call after about a minute and a half.

{¶5} These phone calls were the latest in R.R.'s tumultuous relationship with appellant. Although the relationship ended four months prior, R.R. told Carl that on April 14, she was in a grocery store parking lot when appellant approached her with a gun. He pointed it first at her, then at himself, threatening to "blow his brains out."

{¶6}  R.R. asked Carl to take her to work because she was afraid.  Carl drove R.R. to work and dropped her off directly in front of the restaurant shortly before 8:00 a.m. Carl returned to the restaurant a short time later to pick up breakfast, but found the restaurant surrounded by police, SWAT, and an ambulance.

*Restaurant employees witness murder*

{¶7}  Bob Evans employees, R.R.'s co-workers and friends, testified to events on the morning of April 16. Jane Doe knew R.R. for several years and was familiar with her ex-boyfriend, "Chillie Mo." Although Jane did not know appellant's real name, she identified him in the courtroom as the man she knew as R.R.'s ex-boyfriend. On the morning of April 16, R.R. showed Jane the many missed calls from appellant on her phone.  Jane was working the carryout station of the restaurant and a man called to ask if R.R. was working. Jane lied and said she was not. A short time later, she observed appellant enter the restaurant in dark clothing and a black Covid mask, with only his eyes showing.  He followed R.R. into the rear of the restaurant, an area not authorized for customers, and Jane saw him pull out a gun. Jane heard R.R. scream, followed by approximately four gunshots.

{¶8}  Mary Roe, a prep cook, was also working on the morning of April 16. She too was familiar with "Chillie Mo" as R.R.'s ex-boyfriend and identified him in the courtroom.  Mary was working at her station when she heard a commotion and R.R. came around the corner, screaming, followed by a man. The two passed Mary at the stove. She heard R.R. scream, followed by four or five gunshots.

{¶9}  Beth Poe, another co-worker, knew R.R. had been in a long-term relationship with appellant which had recently ended.  On the morning of April 16, she

observed that R.R. was frightened and nervous because appellant and her new boyfriend had argued, and she was afraid appellant might show up at the restaurant. Around 9:30 a.m., Beth saw appellant enter the restaurant and she knew immediately something was not right because appellant walked at a steady, determined pace and proceeded directly into an unauthorized area of the restaurant. Beth testified appellant "looked crazy" and was "obviously deranged." Beth tried to stop appellant from following R.R., but he would not be deterred. When she was unable to stop appellant, Beth ran out of the restaurant.

{¶10} Ruth Coe was also working on the morning of April 16 and had known R.R. for 10 years. She knew R.R.'s relationship history with appellant. On this day, R.R. was frightened and nervous and showed Ruth the missed calls from appellant on her phone. Ruth testified that appellant entered the restaurant around 9:30 a.m., followed R.R. into the back, and she heard screams and gunshots. Ruth testified that appellant's eyes "looked like he wasn't there."

{¶11} Witnesses reported that R.R. begged appellant "Don't do this to me" and he shot her repeatedly without saying a word.

*Canton police investigate*

{¶12} Canton police were dispatched to the Bob Evans location around 9:30 a.m. for reports of an active shooter. Officer Chris Heslop was the first to arrive on scene and entered the restaurant. He cleared the restaurant and worked his way back to the kitchen, attempting to locate the shooter or victim. He reached a long hallway that led to a storage area and break room, with carts overturned in the hallway. He encountered R.R. lying on her back, under a table, and observed two gunshot wounds, to her chest and hip. Heslop also observed a shell casing.

{¶13} R.R. was treated by SWAT medics but succumbed to her injuries.

{¶14} Appellant fled into the woods and was found by police, talking to his ex-wife on his cell phone. Appellant claimed he wanted to kill himself, but his ex-wife talked him out of it.  Appellant refused to surrender until a K-9 was deployed and apprehended him.

{¶15} Police questioned the Bob Evans co-workers and obtained R.R.'s cell phone records.  On April 15, 2021, R.R. had 134 calls from appellant.  On April 16, 2021, R.R. received 176 calls from appellant, with 70 of those calls occurring between 7:36 a.m. and 9:17 a.m.

{¶16} A Cuyahoga County coroner performed R.R.'s autopsy and described two gunshots to her chest area, either of which would have been fatal.

{¶17} Appellant called a single defense witness, Quasim Faheem, who refers to appellant as his father.  Faheem testified about appellant's relationship with R.R. and said he visited with the two together on April 14, 2021, and saw no issues. Appellant contended through phone calls that R.R. gave him an STD.

{¶18} Appellant was charged by indictment with one count of aggravated murder, an unclassified felony, pursuant to R.C. 2903.01(A) and R.C. 2929.02(A).  The count was accompanied by a firearm specification pursuant to R.C. 2941.145(A).  Appellant entered pleas of not guilty and the matter proceeded to trial by jury. Appellant moved for judgments of acquittal at the close of appellee's evidence and at the close of all the evidence; the motions were overruled.  The jury found appellant guilty as charged.

{¶19} The trial court sentenced appellant to a term of life without the possibility of parole upon the single count of aggravated murder, consecutive to a mandatory 3-year prison term on the firearm specification.

{¶20} Appellant now appeals from the judgment entry of his convictions and sentence.

{¶21} Appellant raises four assignments of error:

## ASSIGNMENTS OF ERROR

{¶22} "I. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST THE APPELLANT, AND THE CONVICTION MUST BE REVERSED."

{¶23} "II. THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND MUST BE REVERSED."

{¶24} "III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED APPELLANT'S REQUEST TO GIVE A JURY INSTRUCTION OF VOLUNTARY MANSLAUGHTER BECAUSE EVIDENCE OF REASONABLY SUFFICIENT PROVOCATION OCCASIONED BY THE VICTIM WAS PRESENTED BY APPELLANT TO WARRANT SUCH AN INSTRUCTION."

{¶25} "IV. APPELLANT'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED AS HE WAS DENIED APPELLATE REVIEW OF HIS SENTENCE UNDER R.C. 2953.08, AS SUBSECTION (D)(3) UNCONSTITUTIONALLY PROHIBITS REVIEW OF A SENTENCE IMPOSED FOR AGGRAVATED MURDER."

## ANALYSIS

### I., II.

{¶26} Appellant's first two assignments of error are related and will be considered together. Appellant argues his aggravated murder conviction is against the manifest

weight and sufficiency of the evidence because there is no evidence he acted with prior calculation and design.  We disagree.

{¶27}  The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.  *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶28} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned, and a new trial ordered."  *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction."  *Id.*

{¶29} Appellant was found guilty of one count of aggravated murder pursuant to R.C. 2903.01(A), which states in pertinent part, "No person shall purposely, and with prior calculation and design, cause the death of another." "'Prior calculation and design' are not defined in the Revised Code but is more than just an instantaneous decision to kill; it encompasses planning 'a scheme designed to carry out the calculated decision to cause the death.'" *State v. Calvert*, 5th Dist. Guernsey No. 03CA19, 2004-Ohio-6366, ¶ 49, citing *State v. Jones,* 91 Ohio St.3d 335, 348, 2001-Ohio-57, 744 N.E.2d 1163, internal citations omitted. Prior calculation and design are considered "a more stringent element than premeditation." *Id., citing State v. Green,* 90 Ohio St.3d 352, 357, 738 N.E.2d 1208, internal citation omitted.

{¶30} Appellant argues there is no evidence of prior calculation and design in the instant case; instead, the evidence suggested his actions were driven by a "sudden heat of passion" provoked by his telephone conversation with Carl on the morning of April 16, which is allegedly the first he knew of the relationship between Carl and R.R.

{¶31} In *State v. Taylor*, 78 Ohio St.3d 15, 18–20, 676 N.E.2d 82, 88–89 (1997), the Ohio Supreme Court considered the meaning of "prior calculation and design," noting the following at page 19:

* * * *

According to  [the 1973 Technical Committee Comment to Am.Sub.H.B. No. 511, a Legislative Service Commission summary], "the phrase 'prior calculation and design' [was employed] to indicate studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim. Neither the

degree of care nor the length of time * * * are critical factors in themselves, but they must amount to more than momentary deliberation."

In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabi, we agreed that "'prior calculation and design' is a more stringent element than the 'deliberate and premeditated malice' which was required under prior law." The General Assembly's apparent intention "was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *Id.,* 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193. Also, in *Cotton,* at paragraph two of the syllabus, we held that "[i]nstantaneous deliberation is not sufficient to constitute 'prior calculation and design.'"

* * * *.

In *State v. Jenkins,* 48 Ohio App.2d at 102, 2 O.O.3d at 75, 355 N.E.2d at 828, the court of appeals found three factors important in determining whether prior calculation and design exists: (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or "an almost instantaneous eruption of events"?

Our review of the preceding cited cases convinces us that it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design." Instead, each case turns on the particular facts and evidence presented at trial.

*State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997).

{¶32} In the instant case, then, the issue is whether appellant acted with "more than momentary deliberation," or whether the act was "an almost instantaneous eruption of events." *Taylor,* supra. We find overwhelming evidence of the former, and the evidence at trial contradicts appellant's argument on appeal.

{¶33} This was not "an almost instantaneous eruption of events" caused when appellant suddenly learned of an STD or a new boyfriend. The evidence showed that he called the victim's phone literally hundreds of times, beginning on April 15, 2021. In the two hours leading up to the murder, appellant called the phone 70 times. There was some evidence that appellant stalked R.R. the night before and the morning of her murder, including circling the restaurant in his vehicle. Appellant's conduct was overt and put the victim was in fear, asking Carl to take her to work and showing her co-workers the missed calls from appellant. Appellant called the Bob Evans restaurant to ask if the victim was working, prompting her friend to lie on her behalf, to no avail. Appellant appeared and entered the restaurant; the victim's co-workers were unable to deter him. He pursued the victim to the back of the restaurant and shot her multiple times.

{¶34} To answer the questions posed by *Jenkins* and re-emphasized by the Ohio Supreme Court, supra, the victim and appellant knew each other, and their relationship

was strained. The victim ended her relationship with appellant, and he was aware of her new relationship with another man. Appellant called the victim repeatedly and obsessively, arguing with Carl, who told him the victim had moved on and didn't want to speak to him. Appellant looked for the victim and called to ensure that she was at her workplace, therefore giving thought and preparation to choosing the murder site. He entered the restaurant wearing all black, with only his eyes exposed, giving himself the advantage of surprise. He deliberately entered the restaurant with a gun, chased R.R. to the back of the restaurant in front of many witnesses, and shot her repeatedly in cold blood while she begged for her life. The act was drawn out, traumatic, and terrifying; this was no spontaneous eruption of events.

{¶35} Appellant also suggests that the jury in part lost it way due to prosecutorial misconduct during closing argument but did not raise this argument as a separate assignment of error. The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. *Sunbury v. Sullivan*, 5th Dist. Delaware No. 11CAC030025, 2012-Ohio-3699, 2012 WL 3525617, ¶ 30 citing *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990). In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A trial is not unfair, if, in the context of the entire trial, it appears clear beyond a reasonable doubt the jury would have found the defendant guilty even without the improper comments. *State v. Treesh*, 90 Ohio St.3d 460, 464, 2001-Ohio-4, 739 N.E.2d 749. Furthermore, both the prosecution and the defense have wide latitude during opening

and closing arguments. *State v. Edwards*, 5th Dist. Licking No. 21CA0083, 2022-Ohio-3534, ¶ 34. We find no plain error in admission of the cited comments, in the context of the entire closing argument, and it is evident beyond a reasonable doubt the jury would have found appellant guilty even without the comments. *Id.*, ¶ 36.

{¶36} When viewed in the light most favorable to appellee, there exists sufficient evidence to support the appellant's conviction of aggravated murder. The jury's finding is not against the manifest weight of the evidence. Further, there is no evidence that the jury lost its way in the instant case.

{¶37} Appellant's first and second assignments of error are overruled.

III.

{¶38} In his third assignment of error, appellant argues the trial court should have given an instruction upon voluntary manslaughter. We disagree.

{¶39} A jury charge on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser or inferior offense. *See, e.g., State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to the defendant. *State v. Smith*, 89 Ohio St.3d 323, 331, 731 N.E.2d 645(2000). Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser-included offense. *State v. Shane*, 63 Ohio St.3d at 632–633, 590 N.E.2d 272; *State v. Conway*, 108 Ohio St.3d at 240,842 N.E.2d at 1027, 2006–Ohio–791 at ¶ 134.

{¶40} When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *State v. Miku*, 5th Dist. Stark No. 2017 CA 00057, 2018-Ohio-1584, 111 N.E.3d 558, ¶ 53.

{¶41} Appellant requested an instruction upon voluntary manslaughter, which is defined by R.C. 2903.03 as follows in pertinent part:

(A) No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.

{¶42} Appellant argues there was serious provocation occasioned by R.R. because he "had just learned" that his long-term relationship was over and that she had a new boyfriend, and allegedly he contracted an STD. Appellant also points to the testimony of one of the Bob Evans witnesses who testified R.R. said Carl and appellant got into a physical fight on April 15, 2021. As noted in our discussion of the first and second assignments of error supra, appellant's argument is belied by the evidence of the phone calls. He did not "just learn" of R.R.'s new relationship the morning of the murder; he was obsessively calling her throughout the 15th and the morning of the 16th. He had the presence of mind to investigate her whereabouts that morning and to stalk her at her workplace. We disagree with appellant's assertion that he acted under the influence of

sudden passion or in a sudden fit of rage, brought on by serious provocation occasioned by the victim.

{¶43} Sudden rage or passion has been described as, "anger, hatred, jealousy, and/or furious resentment." *State v. Smith*, 5th Dist. Guernsey No. 2012-CA-17, 2013-Ohio-1226, ¶ 65, citing *State v. Harris,* 129 Ohio App.3d 527, 535, 718 N.E.2d 488(10th Dist.1998). To determine whether sufficient evidence of serious provocation exists, a trial court must engage in a two-part inquiry. First, the court must objectively determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. *Smith*, supra, 2013-Ohio-1226, ¶ 67, citing *State v. Mack,* 82 Ohio St.3d 198, 201, 1998–Ohio–375, 694 N.E.2d 1328. "If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage.' "Id.*, quoting State v. Shane,* 63 Ohio St.3d 630, 634–35, 590 N.E.2d 724 (1992).

{¶44} In examining whether provocation is reasonably sufficient to bring on a sudden fit of passion or fit of rage, the Ohio Supreme Court has stated "[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *State v. Shane,* 63 Ohio St.3d at 635, 590 N.E.2d 272. In determining whether the provocation was reasonably sufficient, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time. *State v. Mabry,* 5 Ohio App.3d 13, 449 N.E.2d 16 (8th Dist.1982), paragraph five of the syllabus, approved.

{¶45} Unlike self-defense, the issue of who was the aggressor is not the determinative issue in a voluntary manslaughter defense; rather the appellant must show

that he acted under a sudden rage or passion. Further, past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off. *Smith*, supra, 2013-Ohio-1226 at ¶ 70, citing *State v. Huertas,* 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058, 1068–1069 (1990) and *State v. Pierce,* 64 Ohio St.2d 281, 18 O.O.3d 466, 414 N.E.2d 1038 (1980); *State v. Mowls*, 5th Dist. Stark No. 2017CA00019, 2017-Ohio-8712, ¶ 29.

{¶46} Voluntary manslaughter instructions are warranted only when there is sufficient evidence presented at trial which would allow a jury to reasonably to reject the greater offense of aggravated murder or murder and find defendant guilty of lesser offense of voluntary manslaughter. *State v. Byerly*, 5th Dist. Richland No. 02-CA-81, 2003-Ohio-6911, ¶ 33.  In determining whether evidence has been presented to warrant a voluntary manslaughter instruction, the trial court is required to consider the facts of the case and "evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *Id.* citing *State v. Wilkins* (1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303.  In *Shane, supra,* 63 Ohio St.3d at 635, 590 N.E.2d 272, the Ohio Supreme Court also held that the interval between the provocation and the fatal blow must be so close in time that the defendant had no time to "cool off."

{¶47} In the instant case, whether appellant fought with Carl the night before, or only argued with him on the phone at 7:30 a.m., there was clearly a cooling-off period of two hours before appellant stalked R.R. at the restaurant and shot her. See, *Byerly*, supra, 5th Dist. Richland No. 02-CA-81, 2003-Ohio-6911, ¶ 36. During that time, however, appellant was stalking R.R.'s whereabouts.  Moreover, even if the events could be viewed as sufficiently provocative under an objective standard in the case sub judice,

defendant was not entitled to a voluntary manslaughter instruction as a matter of law since there is no evidence defendant subjectively acted under the influence of sudden passion or in a sudden fit of rage brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite defendant into using deadly force. *Id., citing State v. Shane, supra,* 63 Ohio St.3d at 634, 590 N.E.2d 272.  He entered the restaurant through the carry-out door and pursued R.R. into the back, undeterred by the efforts of her co-workers and friends. R.R. did nothing to provoke appellant's murderous rage that day other than attempt to live her life without him in it.

{¶48} In *Byerly,* supra, at ¶ 39-40, we concluded the defendant was not entitled to an instruction on voluntary manslaughter under similar circumstances as the instant case, and the rationale is instructive in the instant case:

> The record contains absolutely no testimony that defendant was under the influence of sudden passion or in a sudden fit of rage at any time during the incident. Upon entering the mobile home, Appellant did not become involved in an argument with the victim, nor did he find the victim and his wife in a situation which could be argued to enrage him.
>
> There is no evidence of any provocation by the victim which would justify the use of deadly force. [The victim] never had an opportunity to even speak with Appellant prior to being shot by him, let alone add fuel to his rage. Appellant came to the trailer armed with at least one loaded gun.
>
> From the evidence presented, we find no reason for the trial court to have charged on voluntary manslaughter.

{¶49} In the instant case, appellant stalked R.R. to the restaurant, entered, pursued her to the back of the building, and shot her multiple times. There is no evidence the two argued, or that R.R. provoked appellant in any way. Appellant appeared at the restaurant for the sole purpose of killing R.R. in cold blood.

{¶50} Under the circumstances, based on our review of the record, no evidence was adduced at trial which would allow the jury to reasonably reject the greater offense of aggravated murder and find defendant guilty of the lesser offense of voluntary manslaughter in the case. *Byerly*, supra, 2003-Ohio-6911, ¶ 41. Appellant was not entitled to an instruction upon voluntary manslaughter and the trial court did not err in this regard.

{¶51} Appellant's third assignment of error is overruled.

IV.

{¶52} In his fourth assignment of error, appellant argues R.C. 2953.08(D)(3) is unconstitutional because the statute states that a sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to appellate review. We disagree.

{¶53} Appellant challenges R.C. 2953.08(D)(3) as unconstitutional, arguing it precludes appellate review of his sentence of life imprisonment without parole, asserting that because R.C. 2953.08(D)(3) does not allow sentences for murder and aggravated murder to be appealed under that statute, it violates his constitutional rights to due process and equal protection. This argument has been reviewed and rejected in other cases, as noted infra.

*Note on the Appellate Record*

{¶54} We agree with appellee that appellant did not properly raise a constitutional argument before the trial court. Generally, a constitutional argument that is not raised in the trial court is "waived and cannot be raised for the first time on appeal." *In re L.Z.*, 5th Dist. No. 15-CA-36, 2016-Ohio-1337, 61 N.E.3d 776, ¶ 29, citing *State v. Brewer,* 2nd Dist. Montgomery No. 26153, 2015-Ohio-693, 2015 WL 848406, ¶ 36.

{¶55} Notwithstanding the issue of waiver, we find appellant's constitutional arguments to be unpersuasive. We first note statutes enjoy a strong presumption of constitutionality. *L.Z.*, supra, 5th Dist. No. 15-CA-36, 2016-Ohio-1337, 61 N.E.3d 776, ¶ 30, citing *State v. Galloway*, 5th Dist., 2015-Ohio-4949, 50 N.E.3d 1001, ¶ 18.

{¶56} Moreover, appellant's argument that he is foreclosed from appealing his sentence is unavailing. Appellant correctly asserts that R.C. 2953.08(D) governs review of felony sentencing and prevents appellate review of sentences for aggravated murder under that statutory section. Specifically, R.C. 2953.08(D)(3) provides that "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review *under this section.*" (Emphasis added.)

{¶57} However, R.C. 2953.08(D)(3) is not the exclusive basis for appealing a sentence. *State v. Jenkins*, 5th Dist. Muskingum No. CT2021-0001, 2021-Ohio-4100, ¶ 35, citing *State v. Patrick,* 164 Ohio St.3d 309, 2020-Ohio-6803, 172 N.E.3d 952, ¶ 15. "Indeed R.C. 2953.02 also provides a right to appeal a judgment or final order to the court of appeals '[i]n a capital case in which a sentence of death is imposed for an offense committed before January 1, 1995, *and in any other criminal case* * * *.' (Emphasis added.) R.C. 2953.02 also provides, 'A judgment or final order of the court of appeals

involving a question arising under the Constitution of the United States or of this state may be appealed to the supreme court as a matter of right.' The final judgment for purposes of appeal under R.C. 2953.02 is the sentence." *Id.,* citing *Patrick* at ¶ 16. Therefore, R.C. 2953.08(D)(3) does not preclude an appellate court's review of a constitutional challenge to a sentence for aggravated murder or murder. Id. at ¶ 22.

{¶58} We do not reach the merits of appellant's fourth assignment of error. *State v. Beard*, 11th Dist. Lake No. 2019-L-165, 2021-Ohio-2384, ¶ 26. As the First District recently noted in *State v. Stumph*, 1st Dist. Hamilton No. C-190318, 2021-Ohio-723, at ¶ 39, in finding it was not "absolutely" necessary to reach the appellant's constitutional challenges to R.C. 2953.08(D)(3) in that case:

> The law is clear that 'courts should avoid reaching constitutional issues if they can decide the case on other grounds.' *DeVan v. Cuyahoga Cty. Bd. of Revision*, 2015-Ohio-4279, 45 N.E.3d 661, ¶ 10 (8th Dist.). Courts should 'not reach constitutional issues unless absolutely necessary.' *See In re D.S.*, 152 Ohio St.3d 109, 2017-Ohio-8289, 93 N.E.3d 937, ¶ 7, quoting *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9.

{¶59} We therefore decline to consider the constitutionality of R.C. 2953.08(D)(3) in this case. *Beard*, supra, 2021-Ohio-2384, ¶ 28. Appellant's sole argument is that R.C. 2953.08 is unconstitutional because it forecloses appellate review of his sentence. However, in *Patrick*, the Supreme Court of Ohio clearly held that R.C. 2953.08(D)(3) does not preclude all appellate review of sentences imposed for murder and aggravated-murder offenses.

{¶60} Appellant's fourth assignment of error is overruled.

**CONCLUSION**

{¶61} Appellant's four assignments of error are overruled, and the judgment of the

Stark County Court of Common Pleas is affirmed.

By: Delaney, J.,

Gwin, P.J. and

Baldwin, J., concur.